# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**NICHOLAS A. SNOW**
Harris Law Firm, P.C.
Crown Point, Indiana

ATTORNEYS FOR APPELLEES:

**GREGORY F. ZOELLER**
Attorney General

**KATHY BRADLEY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| CITY OF GARY, ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | |
| ) | No. 93A02-1312-EX-1016 |
| REVIEW BOARD OF THE INDIANA ) | |
| DEPARTMENT OF WORKFORCE ) | |
| DEVELOPMENT and GUADALUPE T. ) | |
| FRANCO, ) | |
| ) | |
| Appellees-Plaintiffs. ) | |

APPEAL FROM THE INDIANA DEPARTMENT
OF WORKFORCE DEVELOPMENT
The Honorable Steven F. Bier, Chairperson
Cause No. 13-R-04073

**July 22, 2014**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

The City of Gary, Indiana (the "City"), appeals a decision by the Review Board of the Indiana Department of Workforce Development (the "Board") in connection with Guadalupe Franco's application for unemployment benefits finding that Franco had been discharged but not for just cause and was entitled to unemployment benefits. The City raises two issues, which we consolidate and restate as whether the record supports the Board's decision. We affirm.

FACTS AND PROCEDURAL HISTORY

Franco worked as an electro-mechanic for the City's Sanitary District from July 16, 2010, to August 14, 2013.[1] On August 5, 2013, Franco was injured in an accident while working to close an overhead valve which had not been operated for some time, and he received treatment the following day at Comprehensive Care. While at Comprehensive Care, he received an injection and other treatment for pain and provided a urine sample for drug testing. An initial screening was performed at Comprehensive Care, and the results of the initial on-site testing were "non-negative." Transcript at 30. The sample was then sent to MedTox Laboratories Inc. ("MedTox") for additional testing. The results of the MedTox testing were positive for cocaine metabolite. The City terminated Franco's employment for failing a drug test on August 14, 2013.

Franco filed a claim for unemployment benefits, and on September 11, 2013, a deputy for the Indiana Department of Workforce Development issued a Determination of Eligibility which found that Franco had not been discharged for just cause, that sufficient information

_____

1 Franco previously worked for a contractor for the Sanitary District from June 2003 until he began working

2

had not been provided to sustain the City's burden of proof, and that Franco was not disqualified from unemployment benefits. The City appealed the deputy's determination, and a telephonic hearing was held on October 21, 2013, before an administrative law judge (the "ALJ"). The City presented evidence of its workplace policies related to drug testing, and the ALJ heard the testimony of several representatives of the City, Franco, and Dr. Frank Messana, the Medical Review Officer for Comprehensive Care.

The City presented an on-site screening custody form, which contained instructions and fields to be completed with respect to six steps. According to the custody form, step one related to obtaining donor information and consent, step two was to be completed by the collector and involved identifying the temperature of the specimen, the lot number, and the reason for the accident, and step three included certifications by the collector and tester that the on-site test was performed utilizing standard procedures. Following step three, there was a portion of the form to be completed by the Medical Review Officer, or the "MRO." Exhibits at 27. The form stated that step five was to be completed only if the specimen was sent to the lab for testing, and step five included fields to provide the date and the printed name and signature of the tester and a field below the words "received by printed name / signature" with a box next to the words "seal intact." Id. Step six stated "To be completed by MEDTOX" and provided a field for the date and a field below the words "released by printed name / signature." Id.

---

directly for the City in July 2010.

3

In the custody form admitted into evidence, steps one through three were completed, and Dr. Messana signed the section to be completed by the MRO. In the fields for step five, the date of August 6, 2013, is identified along with the printed name and signature of the tester. However, in step five, the field below the words "received by printed name / signature" and the box next to the words "seal intact" were not completed. Id. In addition, the fields in step 6 on the custody form, which was to be completed by MedTox, were not completed.

The record also includes a Laboratory Report, included in the exhibit together with the on-site screening custody form, which indicates the report was completed by MedTox on behalf of Comprehensive Care, that the sample was collected on August 6, 2013, that it was received on August 7, 2013, and that it was reported on August 10, 2013. The Laboratory Report, which contained identification numbers matching those on the custody form, lists the tests requested, indicates that the result of the test for cocaine metabolite was positive, and states that "alternative explanations should be explored for any positive result." Id. at 28. The record also includes a letter dated August 13, 2013, addressed to the City and signed by Dr. Messana stating that Franco had tested positive for cocaine.

Franco testified that he was shocked that there was a positive test result for cocaine, that he had not been using any drugs, and that he was dumbfounded and did not know why that result occurred. He further testified that he had stated to the individuals who were in the room when his employment was terminated that he would do anything possible to clear his name including taking a polygraph or submitting to alternative testing such as a hair follicle

4

test, but the City refused. When asked if he had any prior random drug tests in the previous ten years working at the location, Franco testified that he had random drug tests given to all employees a few times and also several tests in connection with a few incidents in which he had been hurt, and when asked how many prior drug tests he had or if he ever had a positive drug test, Franco replied that he had approximately six or seven prior drug screens and that he never had a positive test. Franco's counsel argued that the City as the employer must submit into evidence reliable documentation from the laboratory establishing that the specimen was received intact and that the chain of custody was maintained by the laboratory and that no such evidence had been submitted in this case. In response, the City called Dr. Messana.

Dr. Messana testified regarding the screening custody form and the practices of Comprehensive Care. He testified that, if an initial screening test is performed at Comprehensive Care and there is a "non-negative," then the sample is sent to the laboratory and step five of the custody form is completed. Id. at 30. Dr. Messana further testified that the laboratory receives the specimen, confirms that the seal is unbroken, and performs another screening. Dr. Messana also testified that the initial screening "is very sensitive so it may pick up some false positives, and when it's sent to the laboratory, it is very specific, [] the follow-up testing they do. So we call it non-negative because there is a potential for it to go to the laboratory and when they do the [] very sensitive testing, . . . it may come back as being a negative test. So we don't refer to them as a positive test, it's just a non-negative . . . ." Id. at 31.

5

The following exchange occurred on cross-examination of Dr. Messana:

Q. And this on-site screening custody form . . . does this show that . . . Medtox indeed received the sample with the seal intact?

A. This form itself does not. They would have a form, there's actually several copies so the first copy the donor takes, copy two is kept for the medical review officer, in this case myself. There's another copy that's sent to the laboratory and they would have that and they would sign off, you know, stating, in the section 6 where they received it and the date so they actually have a copy of that for their records.

Q. So . . . the laboratory itself generates documentation if the specimen was received intact and that the chain of custody was maintained by the laboratory?

A. Correct.

Q. But we don't have that here, do we?

A. I, I do not have that. You'd have to get that, we'd have to get that from the laboratory.

* * * * *

Q. . . . At the bottom of [the Laboratory Report], it says . . . alternate explanations should be explored for any positive result. Do you see that?

A. Correct, yes.

Q. Do you know whether that was done in this case?

A. Yes it was. He was interviewed and asked if he's on any medication, if he's had any dental procedures, or had, or any other situation that could've resulted in a positive test. And he did not have any alternative explanation.

* * * * *

Q. Could [] improper chain of custody possibly explain that?

6

A.    Only if somebody actually intentionally substituted a specimen with one that was containing this metabolite of cocaine. That would be about the only way I could see that. Even if you put, actually put cocaine in the thing it wouldn't come up because you're testing for the metabolite . . . .

Q.    Or, or if you confuse the name of the donors.

A.    Well I don't know how that could happen though because in this case, it's, the chain of custody is with the specimen, he's initialed, he's signed off on it and he's initialed the bottle that has his urine in it . . . .

Id. at 33-35. On re-direct examination, Dr. Messana indicated that, in the event there was a leak or there was an issue, MedTox would find there was an invalid specimen and it would be refused for testing.

The City argued that there was "a failed test and it's gone through a very reasonable and reputable mechanism for ensuring that there are not errors, there are not things wrong," that "[w]e have all the documentation that, you know, is [] possessed by our local office here to show the court," and that "we feel, and the doctor seems to certainly feel that that has a very high degree of reliability." Id. at 37-38. Franco by counsel argued that the City must submit documentation from the laboratory establishing that the specimen was received intact and that the chain of custody was maintained by the laboratory and that, although Dr. Messana testified that there was proper chain of custody at Comprehensive Care, that "from then forward we don't have any evidence of that." Id. at 38. Franco's counsel further argued that Franco was a ten-year employee, that he had undergone drug testing on at least six or seven other occasions, that he was adamant that he was not a drug user, and that he had asked for alternate methods of testing. Franco's counsel also argued that "[w]here there's a zero

7

tolerance policy there should be adequate substantiation of the [] test and in this case there wasn't." Id.

The ALJ issued a decision which affirmed the deputy's determination and concluded that Franco was discharged but not for just cause. The ALJ's decision provides in part:

Decision – Affirmed

FINDINGS OF FACT: . . . [Franco] worked as an Electrol Mechanic 2 fulltime. [Franco] was discharged on August 14, 2013, for a failed drug test.

[The City] has a drug testing policy which allows for an employee to be drug tested if the employee is involved in an accident while working. (Employer's Exhibit 1). If the drug test is proven to be positive the employee is discharged. (Employer's Exhibit 1). [Franco] received and knew of the policy. (Employer's Exhibit 2). The policy is enforced on all employees. The policy is in place to ensure the safety of employees.

On August 5, 2013, [Franco] was injured in an accident while working. [Franco] was sent to Comprehensive Care for medical treatment. [Franco] received some treatment then gave a urine sample for drug testing. The sample returned as a non-negative. The sample was then sent to Medtox Laboratories for further testing. The test was returned as positive for cocaine. (Employer's Exhibit 4). All portions of the Screening Custody Form were filled except for the portion that was to be completed by Medtox. (Employer's Exhibit 4). [Franco] was then discharged on August 14, 2013, for violation of [the City's] drug policy.

CONCLUSIONS OF LAW: . . .

The Administrative Law Judge concludes [the City's] rule meets the above standards and is reasonable. The policy is also enforced on all employees. [Franco] knew of the policy. However, in the present case, [the City] failed to show [Franco] actually violated the policy. [The City] failed to provide sufficient evidence that the drug test was properly performed. The test result form was not completed by the lab that performed the actual test showing the test was positive for cocaine. There is insufficient evidence to show the chain of command [sic] was reliable. Therefore, the Administrative Law Judge concludes [the City] did not meet its burden of proof to show [Franco]

8

knowingly violated a reasonable and uniformly enforced rule. [Franco] was discharged but not for just cause as defined by Ind. Code § 22-4-15-1.

DECISION: On August 14, 2013, [the City] discharged [Franco] but not for just cause in connection with work. The Deputy's Determination of Eligibility dated September 11, 2013, is AFFIRMED. Effective the week ending August 17, 2013, [Franco] is qualified to receive unemployment insurance benefits. Ind. Code § 22-4-15-1(a).

DATED AT INDIANA, THIS 21st DAY OF OCTOBER, 2013[.]

Exhibits at 31-32.

The City filed an appeal from the decision of the ALJ, and on December 2, 2013, the Board, in a two-to-one vote, affirmed the ALJ's decision. In its decision, the Board adopted and incorporated by reference the findings and conclusions of the ALJ and included the following addendum:

> At the hearing, [Franco] questioned the reliability of the test results submitted by MedTox Laboratories Inc. given that there was no completed chain of custody demonstrating that the sample submitted to it was intact and unadulterated. The Medical Review Officer ("MRO"), who is affiliated with the Comprehensive Care Clinic ("clinic"), testified regarding the practices of the clinic, but he had no personal knowledge regarding the practices of MedTox Laboratories Inc. or its receipt and testing of [Franco's] sample. In Owen County v. Indiana Department of Workforce Development, 861 N.E.2d 1282 (Ind. Ct. App. 2007), the court concluded that when a claimant seems credible and the issue boils down to the credibility of the claimant or unknown people in a lab and the reliability of the test results, "the evidence fails to establish just case [sic] for [the Clamaint's] discharge within the meaning of Indiana Code 22-4-15-1." Id. at 1291.

Appellee's Appendix at 7.

> In a dissenting opinion, Review Board Chairperson Steven F. Bier, wrote:

> I disagree with the [ALJ's] decision. [Franco] does not dispute that the urine sample he provided was initialed by him as his sample, and the chain of custody demonstrates that it was handled properly within the clinic. The MRO

9

asked [Franco] if he had an explanation for why the test would have been positive for cocaine, and [he] had no explanation other than that he had received an injection for back pain prior to producing his urine sample. The MRO credibly testified that the injection for pain would not have caused [Franco] to test positive for cocaine metabolites. The drug screening performed at the clinic resulted in a non-negative result for cocaine metabolites. The confirmatory test performed by MedTox Laboratories Inc. simply confirmed the results already found by the clinic. The chain of custody was sufficient to demonstrate that the sample had not been adulterated. The [ALJ] and the other members of the Review Board are imposing an impossible burden on [the City] to present witnesses at every step of the process to demonstrate that the sample was properly handled. I would reverse to conclude that [the City] demonstrated just cause for discharging [Franco].

Id. at 7-8.

## DISCUSSION

The issue is whether the record supports the decision of the Board that Franco was discharged but not for just cause. The Indiana Unemployment Compensation Act provides that "[a]ny decision of the review board shall be conclusive and binding as to all questions of fact." Ind. Code § 22-4-17-12(a). However, Ind. Code § 22-4-17-12(f) provides that when the Board's decision is challenged as contrary to law, the reviewing court is limited to a two part inquiry into: (1) "the sufficiency of the facts found to sustain the decision;" and (2) "the sufficiency of the evidence to sustain the findings of facts." McClain v. Review Bd. of Ind. Dep't of Workforce Dev., 693 N.E.2d 1314, 1317 (Ind. 1998), reh'g denied. The Indiana Supreme Court clarified our standard of review of the Board's decisions in McClain:

Review of the Board's findings of basic fact [is] subject to a "substantial evidence" standard of review. In this analysis the appellate court neither reweighs the evidence nor assesses the credibility of witnesses and considers only the evidence most favorable to the Board's findings.

10

The Board's conclusions as to ultimate facts involve an inference or deduction based on the findings of basic fact. These questions of ultimate fact are sometimes described as "questions of law." They are, however, more appropriately characterized as mixed questions of law and fact. As such, they are typically reviewed to ensure that the Board's inference is "reasonable" or "reasonable in light of [the Board's] findings." The term "reasonableness" is conveniently imprecise. Some questions of ultimate fact are within the special competence of the Board. If so, it is appropriate for a court to exercise greater deference to the "reasonableness" of the Board's conclusion. . . . However, not all ultimate facts are within the Board's area of expertise. As to these, the reviewing court is more likely to exercise its own judgment. In either case the court examines the logic of the inference drawn and imposes any rules of law that may drive the result. That inference still requires reversal if the underlying facts are not supported by substantial evidence or the logic of the inference is faulty, even where the agency acts within its expertise, or if the agency proceeds under an incorrect view of the law.

Id. at 1317-1318 (citations and footnotes omitted).

In Indiana, an employee is ineligible for unemployment benefits if he or she is discharged for just cause. Stanrail Corp. v. Review Bd. of Dep't of Workforce Dev., 735 N.E.2d 1197, 1202 (Ind. Ct. App. 2000), trans. denied; Ind. Code § 22-4-15-1. Ind. Code § 22-4-15-1(d) provides that "[d]ischarge for just cause" is defined to include a "knowing violation of a reasonable and uniformly enforced rule of an employer . . . ."

The City argues that Owen Cnty. is distinguishable from the present case because the evidence in the present case is more comprehensive and that the Board imposed an unreasonable burden of proof on employers in general. The City further argues that Dr. Messana reviewed the test result and that Franco had no alternative explanations for the test result. The City asserts that "if Franco's argument is to be believed, the logical result would be that in order for [the City] to be able to rely on the positive test result received from the laboratory, it would have to be in possession of conclusive evidence that (A) there was no

11

tampering with the sample, which could essentially be done only by pouring urine containing the cocaine metabolite into [the City's] sample, and that (B) there was no inadvertent substitution of samples or other mishandling of [the City's] sample." Appellant's Brief at 19. The City argues that "[t]his is evidence that even the local testing facility does not receive," that the "fact that the laboratory tested the sample and sent back results indicates its honest belief in an unbroken chain of custody," and that "it is highly unlikely that any evidence of intentional tampering with a substance . . . or inadvertent substitution of samples . . . would even be reflected in the laboratory's records." Id. at 19-20.

The Board maintains that its determination that Franco was not discharged for just cause is supported by the evidence and that the City failed to prove a proper chain of custody and thus did not show that Franco violated the City's workplace rule. The Board argues that there is no dispute the proper chain of custody was followed at Comprehensive Care, but that there was evidence that initial screenings turn up some false positives and that any sample that is non-negative is sent to a lab to be more thoroughly tested. The Board asserts that MedTox was responsible for filling in step six on the chain of custody form to confirm the sample was received intact, and that the form does not indicate the seal was intact when it was received. The Board notes Dr. Messana's testimony that the chain of custody form comes in triplicate, that his copy of the form was not signed by MedTox, and that the copy signed by MedTox would have to be obtained from MedTox. In response to the City's claim that the Board placed an extraordinarily high burden on it to produce evidence of discharge for just cause, the Board posits that "[t]his is simply not the case," that the City "could have

12

obtained the chain of custody form from MedTox showing that it received the sample intact," that "[i]nstead, it submitted an incomplete form," that "[i]f the form no longer existed, [the City] could have obtained an affidavit from someone at MedTox showing that the proper chain of custody was observed," and that "[t]his is not an impossibly high burden; it is merely one additional step to complete the process of providing evidence that the chain of custody was followed." Appellee's Brief at 7.

In its reply brief, the City argues that, "[g]ranted, the chain of custody form in question does not have the signature of a person at the laboratory confirming receipt of the urine sample" but that "the form [] *is* completed by a second piece of evidence: the certified laboratory report received from the laboratory" and "[b]oth the chain of custody form and the laboratory report contain matching identifiers, including the donor's name, social security number, date of collection and unique specimen ID number." Appellant's Reply Brief at 3. The City argues that "[t]hese two documents, coupled with the testimony of Dr. Messana and the application of very basic logic [], reasonably lead to the conclusion that the proper procedures were followed at the laboratory." Id. at 4.

The employer bears the initial burden of establishing that an employee was terminated for just cause. Coleman v. Review Bd. of Ind. Dep't of Workforce Dev., 905 N.E.2d 1015, 1019-1020 (Ind. Ct. App. 2009). To establish a *prima facie* case for just cause discharge for violation of an employer rule, the employer has to show that the claimant: (1) knowingly violated; (2) a reasonable; and (3) uniformly enforced rule. Id. at 1020; Stanrail, 735 N.E.2d at 1203. To have knowingly violated an employer's rules, the employee must: (1) know the

13

rule; and (2) know his conduct violated the rule. Stanrail, 735 N.E.2d at 1203. If an employer meets this burden, the claimant must present evidence to rebut the employer's *prima facie* showing. Coleman, 905 N.E.2d at 1020; Stanrail, 735 N.E.2d at 1203. A uniformly enforced rule is one that is carried out in such a way that all persons under the same conditions and in the same circumstances are treated alike. Gen. Motors Corp. v. Review Bd. of Ind. Dep't of Workforce Dev., 671 N.E.2d 493, 498 (Ind. Ct. App. 1996).

Here, the evidence reveals that the purpose of steps five and six of the on-site screening custody form, according to the testimony before the ALJ and Board and the language of the form itself, was to document and establish when a specimen was properly transferred to and received by the laboratory, in this case MedTox, to provide the names and signature verifications of the persons who released and received the specimen, to confirm the dates the specimen was released and received by Comprehensive Care and MedTox, respectively, and to substantiate that the vial or other container holding the specimen was received by the laboratory with its seal intact. In this case, the relevant information on the copy of the screening custody form admitted into evidence established only that the specimen was collected and released by Comprehensive Care. The fields on the custody form which would have certified and established whether and when the specimen was received by MedTox, the person who provided a signature on the form to confirm receipt of the sample, and whether the seal of the vial holding the specimen was intact were not completed and are all blank.

Dr. Messana testified that the initial screening performed at Comprehensive Care was not as specific as the tests performed by MedTox and thus that Comprehensive Care could establish only that the results were non-negative. Dr. Messana further indicated that the custody form in his possession and admitted into evidence did not show that MedTox received Franco's sample with the seal intact and that MedTox would have a copy of the form with the information in step six completed. While Dr. Messana testified regarding his belief that MedTox would not test a sample if there was an issue, the Board in its decision stated that Dr. Messana "had no personal knowledge regarding the practices of MedTox Laboratories Inc. or its receipt and testing of [Franco's] sample," and this finding is supported by the evidence. Appellee's Appendix at 7. In addition, the City did not present evidence that Franco appeared to be under the influence of drugs on the day he was tested, the evidence reveals that Franco had previously submitted to six or seven drug screens and never had a positive result, and Franco offered to submit to alternative testing which the City refused.

Given the fact that relevant fields of steps five and six were not completed, the importance of these steps in the chain of custody, and the serious consequence for an employee of a positive drug test result, we decline to infer, from the fact that test results identifying Franco were sent by MedTox to Comprehensive Care, that the seal must have been intact and that the City met its burden with respect to the chain of custody. This does not have the effect of imposing an impossible burden on the City as it could have produced a copy of the custody form with the relevant fields completed or the testimony or an affidavit

15

of the persons who received, checked the seal of, and tested Franco's sample. The City bore the initial burden of establishing that Franco was terminated for just cause. Moreover, it is the Board's responsibility to weigh the evidence and determine the credibility of the witnesses and, to the extent questions of ultimate fact found by the Board were within its special competence, we exercise greater deference to the reasonableness of the Board's conclusion. See McClain, 693 N.E.2d at 1317-1318. The deputy, the ALJ, and the Board concluded sufficient information had not been provided to sustain the City's burden of proof or to show the chain of custody was reliable. There is sufficient evidence to support the Board's findings and sufficient facts to support its decision, and we cannot say the Board's conclusion is unreasonable.

Under the circumstances and in light of our standard of review, we do not disturb the Board's determination. See Owen Cnty., 861 N.E.2d at 1292-1293 (noting that the employer had the initial burden of showing the former employee knowingly violated a workplace rule, that the employer presented only a document that showed a certain level of marijuana metabolite was found in the employee's specimen, that there was no evidence establishing the reliability or trustworthiness of the tests or the basis for or an explanation of the results, that no one from the lab nor the review officer testified, and there was no testimony that the employee appeared to be under the influence of drugs on the day he was tested, and holding that it is the Board's responsibility to weigh the evidence and determine the credibility of the witnesses, that the Board determined that as between a document with no supporting testimony and the employee's testimony denying drug use the employee was the more

16

credible, that the employer was asking us to reweigh the evidence, and that there was sufficient evidence to support the Board's findings and the decision).

## CONCLUSION

For the foregoing reasons, we affirm the decision of the Board.

Affirmed.

VAIDIK, C.J., and NAJAM, J., concur.